**EXPRESS FUNDING, INC.,**
**Plaintiff/Counter–**
**Defendant,**

v.

**EXPRESS MORTGAGE, INC.,**
**Defendant/Counter–**
**Plaintiff.**

**Civ. No. 94–71856.**

United States District Court,
E.D. Michigan,
Southern Division.

Feb. 3, 1995.

Richard Segal, West Bloomfield, MI, for plaintiff.

Julie Greenberg, Birmingham, MI, for defendant.

COHN, District Judge.

*OPINION*

I.

This is a service mark case. 15 U.S.C. § 1125 *et seq.* Plaintiff/Counter–Defendant, Express Funding, Inc. (Funding), seeks a declaratory judgment that its use of the name "Express Funding, Inc.," does not infringe any rights of Defendant/Counter–Plaintiff, Express Mortgage Brokers, Inc. (Mortgage), to the mark "Express Mortgage." Mortgage in its cross-complaint charges that Funding's use of the name "Express Funding, Inc.," violates Mortgage's rights under the Lanham Act to the mark "Express Mortgage" in the context of Michigan's mortgage market, and brings state claims under the Michigan Consumer Protection Act, M.S.A. § 19.418(1) *et seq.*, [445.902 et seq.], and under a common law unfair competition theory. Mortgage seeks injunctive relief barring Funding from using the mark "Express" in connection with mortgage services, as well as unspecified monetary damages and costs and fees. In its Order of October 18, 1994, the Court denied Mortgage's motion for partial summary judgment or for preliminary injunction. The parties then filed a stipulation of facts and agreed to a decision based on their papers. For the reasons that follow, judgment will be entered in favor of Mortgage.

II.

The following facts are undisputed:

Funding is a Nevada corporation formed in June, 1993, operating in Michigan and nine other states as a "wholesale" mortgage lender, in the business of soliciting completed mortgage loan applications from independent mortgage brokerage companies for processing, underwriting, and possible funding. Funding markets its services to brokers through rate sheets sent by facsimile, and through face-to-face and telephone solicitation by local Funding employees. It does not deal directly with mortgage consumers, only with brokers.

Mortgage is a Michigan corporation formed in 1984.[1] The owner and president of Mortgage, Maurice Janowitz (Janowitz) also owns another company, Sterling Mortgage Investment Co. (Sterling), which, like Funding, funds mortgages. Mortgage operates primarily at the "retail" level of the mortgage industry, offering services directly to consumers. Mortgage has provided some "wholesale" mortgage funding services to other mortgage brokers and lenders, though, and plans to expand its wholesale business. Approximately ninety-five percent of the mortgages originated by Mortgage are funded by Sterling. Mortgage markets its retail services to consumers through television advertisements, direct mailings, newspaper advertising, and miscellaneous promotions such as "give-away" products imprinted with the firm's logo.

Both firms, Funding and Mortgage, include the word "Express" in their respective names and logos: Express Funding, Inc. and Express Mortgage Brokers, Inc. Mortgage has promoted and advertised its name at least since January, 1983. Mortgage's advertising budget currently allots approximately $20,000 per month for television, $12,000 per month for direct mail, and $2,000 for newspa-

---

1. Mortgage states that its "predecessor-in-interest" used the mark "Express" starting in 1983. The record does not reveal any further information about the "predecessor-in-interest."

per advertising. Mortgage's promotions use several variations on its name, including "Express Mortgage Brokers, Inc.," "Express Mortgage," and "Express." Mortgage "primarily identifies itself using the 'Express' mark," and "does not frequently use the entire mark 'Express Mortgage.' "[2]

In a letter to Funding's counsel dated January 28, 1994, Mortgage's counsel indicated that Mortgage has registered the trademark "EXPRESS MORTGAGE" in Michigan (No. M89–073), and holds a federal trademark registration in the trademark "EXPRESS MORTGAGE BROKERS & Design" (No. 1,610,103).[3] Mortgage does not refer in its briefs to having registered state or federal trademarks or servicemarks, and provides no documentation of owning any registered trademarks or servicemarks. A trademark search submitted to the Court by Funding shows that the term "EXPRESS MORTGAGE" is registered in Michigan under the number to which Mortgage referred in its letter to Funding, but does not disclose the owner of the mark.

Funding began to use the mark "Express Funding" in classified advertisements which ran from June through August, 1994, and opened its first Michigan office in July, 1994. Funding has made very limited use of the "Express Funding" mark, operating under the mark "EFI" during the pendency of this litigation.

Mortgage has sought to police the use of the word "Express" in connection with financial services in Michigan. In early 1990, Mortgage obtained a preliminary injunction in this District against the Financial Express Mortgage Company.[4] No copy of this preliminary injunction is contained in the record, and the Court is not aware of the substance of the preliminary injunction.[5] In 1989,

Mortgage objected to Prudential Insurance Company's use of the term "Express Mortgage," and Prudential no longer uses the term in Michigan.

Mortgage has encountered four instances of confusion between itself and Funding.[6] The first instance involved a prospective Mortgage employee who was then employed by another local mortgage company. The prospective employee indicated at an interview that he had seen a classified advertisement run by Funding, and had assumed that Funding was related to or the same company as Mortgage.[7] The second instance involved a representative of a wholesale mortgage funder who indicated to Janowitz that she understood Mortgage and Funding to be the same or related entities. The third instance of confusion consisted of a representative of a bank who was confused as to the identities of Mortgage and Funding. Finally, an investigator from the Michigan Financial Institutions Bureau had to contact Janowitz to determine if information he had received pertaining to a company identified only as "Express" related to Mortgage or to Funding.

## III.

◼ Mortgage's Lanham Act claim against Funding is based on consumer confusion. 15 U.S.C. § 1125(a). To make out such a claim, Mortgage must show:

(1) ownership of a specific service mark in connection with specific services; (2) continuous use of the service mark; (3) establishment of secondary meaning if the mark is descriptive; and (4) a likelihood of confusion amongst consumers due to the contemporaneous use of the parties' service marks in connection with the parties' respective services.

---

2. The quoted language is from a stipulation.

3. The letter does not elaborate as to what the "design" comprises.

4. Case Number 90–CV–60016–AA (LaPlata, J.)

5. The stipulation of facts appears to err in stating that the injunction was included in Mortgage's earlier filed papers as Exhibit D. Mortgage's earlier papers do not include an Exhibit D.

6. The four instances of confusion referred to here are recited in the stipulation of facts. In his second supplemental affidavit, Janowitz identifies five instances of confusion.

7. The fifth instance of confusion noted by Janowitz involved another prospective Mortgage employee, then employed by another local mortgage company, who said he had seen an advertisement of Funding soliciting funding business, and had assumed the advertisement was for Mortgage.

*Homeowners Group v. Home Marketing Specialists,* 931 F.2d 1100, 1105 (6th Cir. 1991).

## A.

"Ownership rights [in a service mark] flow only from prior appropriation and actual use in the market," although registration of a service mark "is at least prima facie evidence of the registrant's ownership and exclusive right to use of a mark." *Homeowners,* 931 F.2d at 1105. Here, at earlier stages of the litigation, there has been some question as to precisely what mark is owned by Mortgage. Throughout its papers, Mortgage refers to its service mark as "the 'Express' mark." Funding argues in its earlier papers that the service mark in question is not "EXPRESS," but "EXPRESS MORTGAGE BROKERS, INC." The samples of Mortgage advertising and letterhead submitted to the Court by both parties variously contain the marks "EXPRESS MORTGAGE BROKERS, INC.," "EXPRESS MORTGAGE," and "EX-PRE$$." This issue appears to be resolved, as the parties have stipulated Mortgage primarily identifies itself with the mark "Express." Because the parties have stipulated to Mortgage's actual use of the mark "Express," Mortgage appears to hold ownership rights not only in the longer phrases "EXPRESS MORTGAGE," and "EXPRESS MORTGAGE BROKERS, INC.,", but also in the mark "EXPRESS," alone, in the field of mortgage services in Michigan.

## B.

It is undisputed that Mortgage has made continuous use of the marks "EXPRESS MORTGAGE BROKERS, INC.," "EX-PRESS MORTGAGE," and "EXPRESS" at least since January, 1983.

## C.

■ Funding claims that Mortgage's service marks are descriptive rather than distinctive, and that the marks therefore must have acquired secondary meaning to be found protectable. 15 U.S.C. § 1052(e)(1). Mortgage says that it "disputes the legal

characterization of the mark as descriptive," but rests its argument on acquired secondary meaning rather than on any inherent distinctiveness of its marks. Because Mortgage does not present a substantive argument addressing inherent distinctiveness, Mortgage's marks will be treated as descriptive.[8]

Mortgage argues that its marks have acquired strong secondary meaning from over ten years of extensive promotion in radio, television, and print advertising. As further evidence of secondary meaning, Mortgage refers to the instances of confusion identified in the stipulation of facts. Express does not argue that the marks have no secondary meaning, but does argue that the marks are weak, as discussed below. It is undisputed that Mortgage's marks have acquired some degree of secondary meaning.

## D.

■ The Sixth Circuit has identified eight factors that are particularly relevant in assessing the likelihood of confusion in the marketplace due to contemporaneous use service marks. The factors are:

1. strength of the plaintiff's mark;

2. relatedness of the services;

3. similarity of the marks;

4. evidence of actual confusion;

5. marketing channels used;

6. likely degree of purchaser care and sophistication;

7. intent of the defendant in selecting the mark; and

8. likelihood of expansion of the product lines using the marks.

*Homeowners,* 931 F.2d at 1106. The Sixth Circuit explained that the factors cannot be applied with mathematical precision, and that "the ultimate question remains whether relevant consumers are likely to believe that the ... services offered by the parties are affiliated in some way." *Id.* at 1107. The determination of whether there is a likelihood of confusion is a mixed question of fact and law:

---

**8.** While the mark "Express," alone, is not descriptive of Mortgage's services, the mark is

shorthand for Mortgage's longer marks, which are descriptive.

Factual findings must be made with respect to the likelihood of confusion factors set out above. However, the further determination of whether a given set of foundational facts establishes a likelihood of confusion is a legal conclusion.

*Id.* (citation omitted).

### 1.

■ Funding argues that Mortgage's marks are very weak. Funding's argument is primarily based on the widespread use of the word "Express," both generally, in the names of firms in Michigan, and specifically, in marks registered to firms in the insurance and financial services market across the country.

Mortgage says that its marks are strong as a result of its extensive promotion and advertising of the marks and its policing of use of the word "Express" by others in the mortgage industry in Michigan. As to others' use of the word "Express," Mortgage argues that use of the disputed mark by other businesses or in other geographic areas does not weaken the strength of its mark in the Michigan market for mortgage services, and says that it believes no other firms in Michigan, with the exception of Funding, are currently using the word "Express" in connection with mortgage services in Michigan. Mortgage cites the actual incidents of confusion noted in the stipulation of facts as evidence of the strength of its marks.

Funding is correct in stating that "extensive third-party uses of a trademark ... substantially weaken the strength of the mark." *Id.* at 1108. In order to show that Mortgage's marks are weak, Funding has presented the results of two searches for the word "Express" in the names of firms registered with the Michigan Department of Com-

merce and in trademarks registered federally and in individual states by firms in the insurance and financial services industries. The marks listed in Funding's exhibits all use the word "Express," and a number of them also use the word "Mortgage." Such marks include "24 HOUR MORTGAGE EXPRESS," "MORTGAGE CHEQUEXPRESS," "MORTGAGE EXPRESS," "MORTGAGE EXPRESS PROGRAM," MORTGAGE EXPRESSPLUS," "MORTGAGE EXPRESSPLUS PROGRAM," "EXPRESS MORTGAGE," "EXPRESS MORTGAGE SERVICE," [9] and at least twenty-four firms whose trade names include the words "Express Mortgage." [10] The marks are attributed to firms around the country.

The rather voluminous search results submitted by Funding, though, do not establish that Mortgage's marks are weak, because they do not reveal the scope of use of the other, similar, marks. As Professor McCarthy has noted, "[t]he mere citation of third party *registrations* is not proof of third party *uses* for the purpose of showing a crowded field and relative weakness." J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 11.27[2][a] (3d ed.1994). The Sixth Circuit has similarly stated:

[i]t is true that merely showing the existence of marks in the records of the Patent and Trademark Office will not materially affect the distinctiveness of another's mark which is actively used in commerce. In order to be accorded weight a defendant must show what actually happens in the marketplace.

*Homeowners*, 931 F.2d at 1108. In *Homeowners*, the Sixth Circuit found that the evidence in question had probative value because it showed many marks that were "cur-

---

9. The record does not reveal how many of these marks are currently in use; some of them are listed in the trademark search as abandoned and others as pending.

10. In a similar case, *Rockland Mortg. Corp. v. Shareholders Funding, Inc.*, 835 F.Supp. 182, 193 (D.Del.1993), the court wrote:

To be sure, plaintiff's mark would be weakened—on of may in a crowded field—if it were simply a descriptive term coupled with the

generic ending "MORTGAGE CORP." The arbitrary portion of its mark, however, bears no resemblance to any example from defendant's list.

Here, Mortgage's marks consist of the word "EXPRESS" coupled with the generic endings "MORTGAGE," or "MORTGAGE BROKERS, INC." It is questionable whether "EXPRESS" is arbitrary, rather than descriptive, and the word appears often in Funding's list of registered marks.

rently registered and believed to be currently in use." *Id.* Here, Funding has only produced evidence of similar registered marks. Nothing in the record allows the Court to determine if the marks are actually in use, what services are provided by the owners of the marks, or the geographic areas in which the marks are used. While Funding has shown that many firms have registered marks using the word "Express," it has not shown that the Michigan mortgage services market is crowded with similar marks that serve to weaken Mortgage's marks.[11]

■ Neither party has submitted direct evidence of the strength of Mortgage's marks in the form of surveys testing consumer recognition of the marks. In the absence of such direct evidence, the Court looks to the indirect evidence of the strength of Mortgage's marks, such as Mortgage's continuing use of its marks since 1983, its extensive promotion of its marks, including television, direct mail, and newspaper advertising, and its efforts to police the use of the word "Express" in connection with the provision of financial services in Michigan. On the basis of this evidence, the Court concludes that Mortgage's marks are strong in Michigan.[12]

### 2.

■ Mortgage and Funding are both involved in the mortgage industry. Mortgage operates primarily at the "retail" level, soliciting business from individual mortgage consumers, while Funding operates primarily at the "wholesale" level, funding mortgages solicited by firms like Mortgage. Mortgage also engages in some degree of "wholesale"

activity, but does not dispute that the bulk of its business is currently "retail."

While the difference between "wholesale" and "retail" mortgage service is significant because of the different consumers of the services, the difference is not dispositive here because Mortgage does engage in some "wholesale" mortgage activities. Mortgage states, through Janowitz's affidavit, that it is engaged to a degree in the "wholesale" side of mortgage services. While it appears that most of Mortgage's "wholesale" activity is conducted by Sterling, the record supports Mortgage's contention that it conducts some "wholesale" business under its own name.[13] Two of Mortgage's advertisements submitted to the Court appear to be specifically addressed to brokers, rather than "retail" consumers. The advertisements refer to Mortgage's "wholesale division," and read in part "Brokers Always Protected." Thus, the services provided by Mortgage and Funding are not only related, but are to an extent identical.

### 3.

In his affidavit, Janowitz says that Mortgage intends to expand its wholesale business. If Mortgage were to increase the "wholesale" business it conducts under its own name and marks, the likelihood of confusion engendered by the parties' simultaneous use of their marks would be increased. As Mortgage currently engages in some "wholesale" mortgage activities, it is not unlikely that Mortgage's "wholesale" activities could expand in the future. The likelihood of expansion of services factors therefore weighs in favor of finding a likelihood of confusion.[14]

---

11. While the parties have not explicitly identified the relevant geographic area in which to consider the strength of Mortgage's marks, they appear implicitly to agree that the relevant market is within Michigan, as the stipulation of facts repeatedly refers to business conducted and marks used within Michigan.

12. Funding's argument that the names of mortgage service providers are inherently not distinctive is unpersuasive. Funding seeks to analogize mortgage service providers to banks, but points to no authority restricting the range of names available to mortgage service providers. *Compare Empire Nat. Bank of Traverse City v. Empire of America*, 559 F.Supp. 650, 655 (W.D.Mich. 1983) (finding that "a bank's name has few inherent distinctive properties," and noting that "under federal law, all national banking associations must have the word national in their names. 12 U.S.C. § 22.").

13. The stipulation of facts refers to a document from the Michigan Department of Commerce indicating that Mortgage did not originate or fund any loans in 1993. The document is not in the record, and even if Mortgage did not fund any loans in 1993, it does not follow that Mortgage never has and does not currently engage in some wholesale activity.

14. This conclusion is not altered by the assertion of Funding's president, Neil Kornswiet (Kornswiet), in his affidavit that Funding has no inten-

#### 4.

■ With regard to the similarity of the marks, Funding says that "a glance at the marks is sufficient to see that, although they share the word[ ] "Express," the similarity is slight," while Mortgage says Funding "is using [Mortgage's] "Express" mark exactly." With regard to the marks "EXPRESS MORTGAGE," and "EXPRESS MORTGAGE BROKERS, INC.," Mortgage argues in its reply brief "Express" is "clearly the dominant part of each parties' mark."

The predecessor to the Court of Appeals for the Federal Circuit in *Burger Chef Systems, Inc. v. Sandwich Chef, Inc.*, 608 F.2d 875, 878 (Cust. & Pat.App.1979), wrote:

> although the involved marks must be regarded in their entireties, it is proper to recognize that one feature of a mark is more significant than the other features and to give greater force and effect to that dominant feature.

Even so, "[i]t is the overall impression of the mark, not an individual feature, that counts," and the Court must view the marks "in their entirety and in context" in order to determine whether the marks will be confusingly similar when presented to the public in the marketplace. *Homeowners*, 931 F.2d at 1109 (citations omitted).

To the extent that Mortgage has rights to the mark "EXPRESS," alone, in the Michigan mortgage services market, Funding's mark appropriates Mortgage's mark in its entirety. With regard to the longer marks, both parties' marks consist of generic terms—"FUNDING," "MORTGAGE," or "MORTGAGE BROKERS, INC.,"—appended to the word "EXPRESS." Because of the genericity of the remainder of the marks, "EXPRESS" is the dominant feature of both parties' marks, leading to the conclusion that the marks are similar to a significant degree. The genericity of the remainder of the marks also distinguishes the marks at issue here from one like "AMERICAN EXPRESS," or "FEDERAL EXPRESS," in which the terms combined with "EXPRESS" are arbitrary. The similarity of the marks factor therefore

tion of expanding into the "retail" mortgage

weighs in favor of finding a likelihood of confusion.

#### 5.

■ The stipulation of facts refers to four instances of actual confusion. In all four instances, the individuals confusing Mortgage and Funding were apparently familiar with the mortgage industry. One instance involved a prospective Mortgage employee who was then employed by another local mortgage company, two involved representatives of a wholesale mortgage funder and a bank, respectively, and the last involved an investigator for the Michigan Financial Institutions Bureau, who was unable to determine if information he had received pertaining to "Express" referred to Mortgage or to Funding. Mortgage says these instances of confusion are the best evidence of likelihood of confusion. *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1188 (6th Cir.1988). Funding responds that no individuals who have responded to its advertisements soliciting employees have expressed any confusion between it and Mortgage, and that the confusion evidenced in the instances cited by Mortgage merits little weight.

Regarding evidence of actual confusion, the Sixth Circuit has said:

> Even though evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion it does not follow that any type of quantum of such evidence is entitled to significant weight in the determination.

*Homeowners*, 931 F.2d at 1110. Where both parties have been doing business "in the same area for some time," isolated incidents of confusion will not carry great weight. *Id.* Also,

> [p]erhaps as important as the number of instances of confusion are the kinds of persons confused and degree of confusion. "Short-lived confusion or confusion of individuals casually acquainted with a business is worthy of little weight," while chronic mistakes and serious confusion of actual customers are worthy of greater weight.

*Homeowners*, 931 F.2d at 1110 (citation omitted).

market in Michigan.

While the instances of confusion identified in the stipulation of facts do not involve confusion of actual consumers, the most directly relevant sort of confusion, they all involve individuals who are presumably well acquainted with the Michigan mortgage industry. This is also not a case of isolated incidents of confusion between two parties who have been doing business in the area for a long period of time; rather, the incidents all occurred in the relatively short span of time following Funding's commencement of operations in Michigan in the summer of 1994. Because these incidents of confusion involved individuals apparently well acquainted with the mortgage industry and do not appear to be isolated incidents of confusion between commonly distinguished parties, they constitute strong evidence of a likelihood of confusion.

### 6.

■ Mortgage argues that although Funding has not yet engaged in extensive marketing, when it does it will inevitably use the same channels as Mortgage because "marketing channels used in this field are well-established and limited." Funding responds that there is no overlap between the marketing channels used by the parties, as they each target different markets. Funding says that it operates at the "wholesale" level, targeting mortgage brokers by facsimile, telephone, and face-to-face solicitations, while Mortgage operates at the "retail" level, advertising to the general public through television, radio, and newspaper advertisements. Mortgage replies that the distinction between "wholesale" and "retail" mortgage activity is artificial.

With regard to marketing channels used by parties to a trademark suit, the Sixth Circuit has said:

Obviously, dissimilarities between the predominant customers of a plaintiff's and defendant's goods or services lessens the possibility of confusion, mistake, or deception. Likewise if the services of one party are sold through different marketing media in a different marketing media in a different marketing context than those of another seller, the likelihood that either group of buyers will be confused by similar

marks is much lower than if both parties sell their services through the same channels of trade. As one commentator has noted:

If one mark user sells exclusively at retail and the other exclusively to commercial buyers, then there may be little likelihood of confusion since no one buyer ever buys both products. For example, if one user sells food only at retail to consumers and the other sells only to commercial food brokers (and the product never reaches consumers under the mark), then there is no one buyer who will be faced with both products, and hence no confusion.

*Homeowners,* 931 F.2d at 1110 (quoting 2 J. McCarthy, *Trademarks and Unfair Competition* § 24:7 at 190–91 (2d ed.1984) (footnote omitted)).

Here, although Mortgage markets its services primarily to the general public through television, radio, and television advertising, it also markets its more limited "wholesale" activities to brokers, the same audience targeted by Funding's advertising. Because Mortgage does engage in some "wholesale" activity, at the very least mortgage brokers will be exposed to the services of both parties. Furthermore, "retail" consumers of mortgages ultimately make their payments to the lender, not the broker, so "retail" consumers will still come into contact with Funding, even if Funding's marketing is not directed toward the general public. Because there is some overlap in the targets of Mortgage's and Funding's marketing, i.e., mortgage brokers, this factor weighs slightly in favor of finding a likelihood of confusion.

### 7.

■ Mortgage says that its customers, primarily "retail" consumers of mortgage services, do not engage in frequent repeat business and rely on the state's regulation of the field to insure the quality of their mortgage provider, with the result that they are unsophisticated as to the identity of the companies involved in the market, and easily confused. Mortgage also argues that any negative information consumers receive about Mortgage will inevitably be attributed

to Funding "as a result of the public's mis-perception of an existing relationship," and that employees of other mortgage companies, "regardless of sophistication, will *assume* ... that a relationship of some sort exists" between Mortgage and Funding. (emphasis in original).

Funding responds that consumers of mortgage services, the bulk of Mortgage's customers, are likely to take great care in selecting a service provider because the decision to purchase or refinance one's property is not typically made lightly, making confusion on their part unlikely. Funding further argues that its own customers, mortgage brokers and lenders, are "sophisticated commercial buyers who are purchasing business services or services for resale in the course of their business," *Homeowners,* 931 F.2d at 1111, who because of their expertise in the field are less likely to be confused.

Funding has the better argument. With regard to "retail" mortgage consumers, as the Sixth Circuit held in *Homeowners,*

> when services are expensive or unusual, the buyer can be expected to exercise greater care in her purchases.... [B]ecause selling [or mortgaging] one's property is likely the most significant commercial transaction ever undertaken for most people, ... customers are likely to carefully select the provider of sales [or mortgage] services.

*Id.* Mortgage's argument that those employed in the mortgage industry, because of their familiarity with Mortgage's marks, will be confused regardless of their sophistication is counter-intuitive. Those employed in the mortgage industry, because of their sophistication, are the least likely to be confused—"[w]hen the relevant buyer class is composed of such professional purchasers the likelihood of confusion is lower." *Homeowners,* 931 F.2d at 1111. The likelihood of purchaser care and sophistication factor therefore does not support a likelihood of confusion.

#### 8.

Mortgage concedes that in selecting its mark Funding had no intention of capitalizing on Mortgage's goodwill, but argues that "[t]he innocent original intent in selecting the mark has been negated by the ongoing intentional use of an infringing mark." Mortgage cites no authority for its position, and no evidence that Funding is intentionally infringing Mortgage's marks. Funding's filing of a declaratory judgment action suggests that Funding does not believe it is infringing Mortgage's marks. The intent factor does not support a likelihood of confusion.

#### E.

In sum, six of the eight likelihood of confusion factors support a finding of a likelihood of confusion. The Court is satisfied that Funding use of the name "Express Funding, Inc." in connection with the provision of its services is likely to cause confusion among consumers between it and Mortgage. Because Mortgage has shown all four elements of a Lanham Act claim based on consumer confusion, 15 U.S.C. § 1125(a), it is entitled to judgment in its favor as to the Lanham Act claim.

### IV.

For the reasons stated, the Court finds that Funding's use of the name "Express Funding, Inc." in connection with the provision of its services in Michigan constitutes infringement of Mortgage's marks under the Lanham Act. On notice, Mortgage shall submit a form of judgment including an appropriate injunction.