**NOT RECOMMENDED FOR PUBLICATION**
File Name: 15a0106n.06

**No. 14-3680**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| ANTHIMOS PANTELERIS, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| AALISON PANTELERIS, fka Aalison Denton, | ) | COURT FOR THE NORTHERN |
| | ) | DISTRICT OF OHIO |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

**FILED**
Feb 04, 2015
DEBORAH S. HUNT, Clerk

BEFORE: SILER, GRIFFIN, and WHITE, Circuit Judges.

GRIFFIN, Circuit Judge.

Defendant Aalison Panteleris appeals the district court's grant of plaintiff Anthimos Panteleris's petition for return of their three children to Australia under the International Child Abduction Remedies Act, 22 U.S.C. § 9001 *et seq.*, which codifies the Hague Convention on the Civil Aspects of International Child Abduction. Because the district court did not clearly err in its factual findings, we affirm.

I.

Anthimos Panteleris, a citizen of Australia, and Aalison Panteleris, a citizen of the United States, married in the United States in 2005. Four months after their first child was born in the United States, the family traveled to Australia in March 2007. The Panterelises had two more children in Australia. The family lived together in Australia until they traveled to the United

States in March 2012. The parties dispute the purpose of their travel to the United States. Mr. Panteleris testified that the family intended to take a six-month to one-year extended vacation to visit Ms. Panteleris's family in Ohio, similar to a holiday Mr. Panteleris had taken with his parents when he was four years old. Ms. Panteleris testified that the family had relocated to the United States indefinitely. At the time of their arrival in the United States, the children were aged five years, three years, and four months.

In April 2012, after visiting Hawaii for several weeks, the family arrived in Ms. Panteleris's hometown of Salem, Ohio. They moved into an apartment with a one-year lease. Ms. Panteleris obtained employment and Mr. Panteleris, who could not work under his visa status, stayed at home with the children. The eldest two children were enrolled in school. Ms. Panteleris later quit her job in November 2012, and the family's savings were largely depleted. On December 2, 2012, Mr. Panteleris returned to Australia alone. Mr. Panteleris testified that he returned to Australia to obtain employment and prepare for the family's return to Australia. According to Mr. Panteleris, after he secured a stable job, he requested in May 2013 that Ms. Panteleris and the children return to Australia but Ms. Panteleris refused.

Shortly thereafter, Mr. Panteleris contacted the Australian government and social service organizations for information on his rights. In November 2013, he filed an application for return of his children with the Australian Central Authority for the Hague Abduction Convention. In December 2013, the United States Central Authority for the Hague Abduction Convention sent Ms. Panteleris a "voluntary return letter," but she refused to voluntarily return the children to Australia. Mr. Panteleris filed a petition for return of the children in United States district court on February 28, 2014. He also filed a motion for a preliminary injunction, requesting that the children not be removed from the court's jurisdiction. The parties stipulated to maintain the

status quo, and the court entered an order reflecting the stipulation. The court held a five-hour evidentiary hearing. In July 2014, the court issued an opinion and order granting plaintiff's petition and ordering the children returned to Australia. Thereafter, we granted defendant's emergency motion to stay the order pending appeal.

## II.

Defendant's appeal is limited to four factual findings rendered by the district court. Ms. Panteleris disputes that (1) Mr. Panteleris exercised his custody rights, (2) the children are habitual residents of Australia, (3) the date of wrongful retainment is May 2013, and (4) Mr. Panteleris never consented to retention of the children in the United States. "In a case involving an action for return of a child under the Hague Convention, this court reviews the district court's findings of fact for clear error and reviews its conclusions about American, foreign, and international law *de novo*." *Simcox v. Simcox*, 511 F.3d 594, 601 (6th Cir. 2007) (internal quotation marks and alterations omitted).

The Hague Convention provides that a child abducted in violation of "rights of custody" must be returned to the child's country of habitual residence, unless certain exceptions apply. *Abbott v. Abbott*, 560 U.S. 1, 5 (2010) (citing Hague Convention, Oct. 25, 1980, T.I.A.S. No. 11670, S. Treaty Doc. No. 99-11, art. 3). The Convention is designed "'to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access.'" *March v. Levine*, 249 F.3d 462, 465 (6th Cir. 2001) (quoting the Hague Convention preamble). The Convention "is generally intended to restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court." *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir. 1996) ("*Friedrich II*").

The United States is a contracting state to the Convention. *Abbott*, 560 U.S. at 5. Congress has implemented its provisions through the International Child Abduction Remedies Act ("ICARA"), 102 Stat. 437, 22 U.S.C. § 9001 *et seq.* (formerly 42 U.S.C. § 11601 *et seq.*). *Id.*

"The Convention's central operating feature is the return remedy. When a child under the age of 16 has been wrongfully removed or retained, the country to which the child has been brought must 'order the return of the child forthwith' unless certain exceptions apply." *Id.* at 9 (quoting the Hague Convention, art. 12). Under the ICARA, a petitioner must establish by a preponderance of the evidence that his children were wrongfully removed or retained in breach of his custody rights under the laws of the contracting state in which the children habitually resided immediately before the removal or retention. 22 U.S.C. § 9003(e)(1)(A). Once the petitioner establishes wrongful removal, the burden shifts to the respondent to establish an exception. *Id.* § 9003(e)(2). For example, a court is not required to order the return of a child when at least one year has elapsed between the wrongful removal or retention and commencement of return proceedings in a judicial or administrative authority of the contracting state, and the respondent establishes by a preponderance of the evidence that "the child is now settled in [his or her] new environment." Hague Convention, art. 12; 22 U.S.C. § 9003(e)(2)(B). Similarly, a court is not required to order a child's return if the respondent establishes by a preponderance of the evidence that the petitioner "was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention." Hague Convention, art. 13(a); 22 U.S.C. § 9003(e)(2)(B).

A.

Ms. Panteleris maintains that she did not wrongfully retain the children because Mr. Panteleris consented to the family's "relocation" to the United States. Her argument implicates

two of the district court's factual findings—that Mr. Panteleris exercised his custody rights, and the children are habitual residents of Australia, not the United States.

1.

The removal of a child from the country of his or her habitual residence is "wrongful" under the Hague Convention if the non-removing parent exercises or otherwise would exercise custody rights to the child under that country's law at the time of removal or retention. *Friedrich II*, 78 F.3d at 1064. Although the Hague Convention does not define "exercise," our court has held that a person "cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Id.* at 1066. The petitioner has the burden of proving that he exercised custody rights by a preponderance of the evidence. *Id.* at 1064. Once a court determines that the petitioner exercised custody rights in any manner, the court does not consider whether the parent exercised the custody rights well or badly because those matters go to the merits of the custody decision and are, therefore, beyond the subject-matter jurisdiction of the federal courts. *Id.* at 1066 (citing 42 U.S.C. § 11601(b)(4), *recodified at* 22 U.S.C. § 9001(b)(4)).

In this case, the district court found that, at the time of wrongful retention, Mr. Panteleris was exercising his custody rights under the Australian Family Law Act by maintaining a relationship with his children. On appeal, Ms. Panteleris does not dispute that Mr. Panteleris had custody rights, but argues that he voluntarily relinquished his rights by returning to Australia and making only "sporadic" attempts to contact the children. This recharacterization of the facts falls short of "clear and unequivocal abandonment." *See id.* at 1066.

The district court addressed this issue in detail, observing that "courts should 'liberally find "exercise" whenever a parent with de jure custody rights keeps, or seeks to keep, any sort of

regular contact with his or her child.'" The district court found that Mr. Panteleris "regularly" communicated with his children between December 2012 and May 2013, the date of wrongful retention. Moreover, although Mr. Panteleris did not provide direct financial support, Ms. Panteleris made withdrawals from the parties' joint bank account in Salem, Ohio, and Mr. Panteleris offered to reimburse her for family expenses if she provided him with bills or receipts. There was no evidence that Ms. Panteleris had provided Mr. Panteleris a bill or receipt that he refused to pay. Moreover, the court observed that "[t]he record is replete with [Mr. Panteleris's] well-documented visa difficulties and references to the poor financial situation of the Panteleris family. It follows that the family members could ill afford airline tickets to Australia, and the three children, one of whom is autistic and the eldest of whom is now seven, could not safely fly unaccompanied." The district court thus concluded that Mr. Panteleris had not failed to exercise his custody rights during the relevant time period. The district court did not clearly err.

2.

A child's country of habitual residence is a question of fact that this court reviews for clear error. *Jenkins v. Jenkins*, 569 F.3d 549, 556 (6th Cir. 2009); *Robert v. Tesson*, 507 F.3d 981, 995 (6th Cir. 2007). The Hague Convention prohibits the removal of a child, in breach of custody rights, from "'the State in which the child was habitually resident immediately before the removal [or retention.]'" *Simcox*, 511 F.3d at 602 (quoting the Hague Convention, art. 3). Although the Convention does not define "habitual residence," our court has held that "a child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective." *Robert*, 507 F.3d at 998. We have established five principles to consider in determining a child's habitual residence:

> First, habitual residence should not be determined through the technical rules governing legal residence or common law domicile. Instead, courts should look closely at the facts and circumstances of each case. Second, because the Hague Convention is concerned with the habitual residence of the child, the court should consider only the child's experience in determining habitual residence. Third, this inquiry should focus exclusively on the child's past experience. Any future plans that the parents may have are irrelevant to our inquiry. Fourth, a person can have only one habitual residence. Finally, a child's habitual residence is not determined by the nationality of the child's primary care-giver. Only a change in geography and the passage of time may combine to establish a new habitual residence.

*Robert*, 507 F.3d at 989 (internal citations, quotation marks, and alterations omitted) (citing

*Friedrich v. Friedrich*, 983 F.2d 1396, 1401 (6th Cir. 1993) ("*Friedrich I*")).

In this case, the district court considered the children's activities in Australia, including school, social engagements, and meaningful connections to people and places in Australia. It also considered the children's activities and meaningful connections in the United States, but observed that it could not accept evidence of habitual residence for dates after May 2013 because our court's precedent instructs courts to look back in time from the period of wrongful retention, not forward. The district court also considered the children's belongings that the family brought to the United States and items left in Australia. Weighing all the evidence, the district court concluded that Mr. Panteleris had established by a preponderance of the evidence that the children were habitual residents of Australia at the time of the wrongful retention.

On appeal, Ms. Panteleris argues that the court's factual finding was clear error because a period of one year is significant in the lives of young children and, under the *Friedrich I* factors, the children had acclimatized to the United States. Second, she contends that her ability to establish the children's habitual residence in the United States was prejudiced by the district court's denial of her motion for additional hearing time. Finally, she argues that this court

should adopt "the subjective intent of the parents" as an additional factor for determining habitual residence.

Ms. Panteleris's first argument reflects a difference of opinion on how to weigh the evidence, but not clear error. Although there is testimony to support that the children may have perceived the United States as their country of habitual residence, there is likewise evidence to support the district court's factual finding. Indeed, one year may be a significant amount of time in the life of a young child. However, Ms. Panteleris has failed to establish that the district court clearly erred in finding that, in light of all the evidence, Australia was still the children's habitual residence from their perspective.

Second, regarding Ms. Panteleris's motion for more hearing time, she has failed to preserve the issue for appeal. Prior to the evidentiary hearing, she filed a motion to extend the five-hour hearing to accommodate more testimony. The district court denied the motion, encouraging the parties to stipulate to certain facts and rely on transcribed testimony to reduce the need for live testimony. At the hearing, Ms. Panteleris did not ask for additional time or proffer what the additional testimony would have established. Nor has Ms. Panteleris appealed the district court's order denying her motion. Accordingly, she has failed to preserve the issue for appeal.

Finally, Ms. Panteleris urges us to adopt "the subjective intent of the parents" as an additional factor in determining a child's habitual residence, at least with respect to young children and those with developmental disabilities. Our court has previously considered similar arguments. In *Robert v. Tesson*, 507 F.3d at 990−91, we rejected the Ninth Circuit's approach in *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001), which considers "the subjective intentions of the parents [as] all but dispositive of a child's habitual residence." We found the Ninth Circuit's rule

"inconsistent" with *Friedrich I* and "the Convention's goal of deterring parents from crossing borders in search of a more sympathetic court" because such a rule "empowers a future abductor to lay the foundation for an abduction by expressing reservations over an upcoming move." *Robert*, 507 F.3d at 992 (alterations omitted). Nevertheless, we left open the possibility that "a very young or developmentally disabled child *may* lack cognizance of their surroundings sufficient to become acclimatized to a particular country or to develop a sense of settled purpose." *Id.* at 992 n.4 (emphasis added). However, because that case did not present such facts, we "express[ed] no opinion on whether the habitual residence of a child who lacks cognizance of his or her surroundings should be determined by considering the subjective intentions of his or her parents." *Id.*

We need not decide whether the Pantelerises' subjective intent should be considered because it would not change the outcome in this case under the deferential standard of review. The district court explicitly found that even if it were to consider the subjective intent of the parents, "the evidence submitted as to the intent of the parents favors [Mr. Panteleris's] version—that the parties intended to stay in Ohio for one year." Just as the district court's factual finding of the children's habitual residence is not clear error, Ms. Panteleris has not shown that the district court's implicit credibility determination favoring Mr. Panteleris's version is clear error in light of all the evidence.

B.

For purposes of establishing that her children were "settled in [their] new environment," under Article 12 of the Hague Convention, Ms. Panteleris disputes the lower court's finding that May 2013, and not December 2, 2012, is the date of wrongful retention. As the respondent, Ms. Panteleris had the burden of establishing by a preponderance of the evidence that one year or

more had elapsed between the wrongful retention and the filing of a petition for return of the children. Hague Convention, art. 12; 22 U.S.C. § 9003(e)(2)(B).

Ms. Panteleris argued before the district court that Mr. Panteleris knew in December 2012 that she and the children would not return to Australia. However, she also testified that she did not specifically tell him that the children were not returning to Australia or that she intended for them to remain in the United States permanently. She further testified that she informed Mr. Panteleris that their marriage was over "at the end" of February or March 2013. Nevertheless, the district court observed that communicating her intention to end the marriage was not necessarily a refusal to return the children. Mr. Panteleris testified that Ms. Panteleris told him in May 2013 that the children would not be returning. Absent evidence that the conversation in which Ms. Panteleris refused to return the children to Australia took place before February 28, 2013, the district court concluded that Ms. Panteleris had not established by a preponderance of the evidence that Mr. Panteleris's petition had been filed one year or more after the date of wrongful retention. Moreover, the court observed that, although not dispositive, business records from a social services agency supported that Ms. Panteleris had informed Mr. Panteleris of her intention to retain the children no sooner than the end of February 2013.

On appeal, Ms. Panteleris argues that Mr. Panteleris knew or should have known in December 2012 that the children would not be returning, and Mr. Panteleris voluntarily relinquished his custody rights in December 2012. Her arguments are unpersuasive. First, as above, Ms. Panteleris did not meet her burden before the district court of establishing that Mr. Panteleris knew or should have known in December 2012 that the children would not return. And the court's conclusion that he did not know until after February 2013 was not clear error.

Second, we have already concluded that her relinquishment-of-custody-rights argument fails under the "clear and unequivocal abandonment" standard. *See Friedrich II*, 78 F.3d at 1066.

C.

Finally, Ms. Panteleris contends that the district court clearly erred in finding that Mr. Panteleris did not consent or acquiesce to retention of the children in the United States under Article 13 of the Hague Convention. As the respondent, Ms. Panteleris had the burden of establishing by a preponderance of the evidence that Mr. Panteleris had consented to the retention. 22 U.S.C. § 9003(e)(2)(B). Ms. Panteleris relies on the same evidentiary arguments as above to support her assertion that there was no wrongful retention. It is undisputed that Mr. Panteleris consented to visiting the United States for approximately six months to one year. However, the district court found that Ms. Panteleris had failed to show by a preponderance of the evidence that Mr. Panteleris consented or acquiesced to the children living in the United States permanently. The parties do not dispute that by late winter 2012 or early spring 2013, Mr. Panteleris asked Ms. Panteleris to return the children to Australia and she refused. Because we concluded above that the district court did not clearly err in finding that Ms. Panteleris had wrongfully retained the children, we also conclude that the district court did not clearly err in finding that Ms. Panteleris had not sustained the greater burden of showing consent by a preponderance of the evidence.

III.

For these reasons, we AFFIRM the judgment of the district court and VACATE the previously issued stay.

-11-

**HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part.**

I join in the majority opinion except with respect to the children's habitual residence. As to that issue I would remand for further proceedings.

The district court correctly set forth the law applicable to this dispute, and properly applied that law to facts reasonably found based on the evidence, concluding that Mr. Panteleris exercised his custody rights, Ms. Panteleris retained the children as of May 2013, and Mr. Panteleris did not consent to Ms. Panteleris's retention of the children in the United States. I conclude, however, that the court's findings regarding the children's habitual residence are too conclusory under the circumstances to permit meaningful review of Ms. Panteleris's second claim of error.

Mr. Panteleris has the burden of showing that as of the date of Ms. Panteleris's wrongful retention, the habitual residence of the children was Australia. As of May 2013, the Pantelerises' young children were physically present in the United States for approximately fourteen months—thirteen months in Ohio. The district court well understood that the question before it was whether, as of that date, the children's habitual residence was in Australia or Ohio—more specifically, whether they had been in their new environment "an amount of time sufficient for acclimatization and . . . a degree of settled purpose from the child[ren]'s perspective." *Robert v. Tesson*, 507 F.3d 981, 998 (6th Cir. 2007).

Mr. Panteleris presented evidence showing that while in Australia, the children experienced all the elements that would establish Australia as their habitual residence. The court urged Ms. Panteleris to focus on the relevant time period, which, by definition, ended in May 2013. Perhaps because counsel was eager to establish that the retention commenced in December 2012, or sometime before February 2013, and to then establish that the children were

"settled in [their] new environment," Hague Convention, art. 12, Ms. Panteleris presented general testimony regarding the children's time in Ohio and failed to confine that testimony to the period ending May 2013. Nevertheless, as the district court recognized in its Memorandum Opinion and Order, the children had lived in Ohio for thirteen months, B.P. was enrolled in kindergarten, H.P. was enrolled in preschool and was receiving therapy for autism, and the children had a relationship with Ms. Panteleris's mother and sister. The evidence also established that the youngest child, Z.P., had lived in the United States since she was four months old, and by May 2013, had spent nearly two-thirds of her life in the United States.

Ms. Panteleris could and should have given the district court more to work with in engaging with the habitual-residence issue. Still, I conclude that the district court was obliged to directly address the issue whether the habitual residence that the court correctly found existed in Australia when the family departed that country in March 2012 still existed in May 2013, or, alternatively, the children had been in Ohio "for an amount of time sufficient for acclimatization" and had established through their day-to-day lives in Ohio "a degree of settled purpose from [their] perspective." *Robert*, 507 F.3d at 998. Given that the youngest child recognized no other home than Ohio, the middle child began preschool and autism treatment in Ohio, and even the oldest spent a significant portion of his life in Ohio, the district court was required to explain why Australia was still, and Ohio was not, the children's habitual residence as of May 2013. *See Robert*, 507 F.3d at 996 (assuming arguendo children were residents of France during a fifteen-month stay there, but concluding that during a nine-month stay in the United States children took up new habitual residence in the United States by comparing the children's connections to each country). The court did not do so; rather, it simply reviewed the evidence and stated its conclusion that Mr. Panteleris "established by a preponderance of the

evidence that, from the perspective [of] the children, the habitual residence of the children is in Australia."

In sum, notwithstanding Ms. Panteleris's failure to directly address the circumstances of the children in May 2013, the thirteen-month period is sufficiently significant given the children's ages and schooling that the district court was obliged to explain its conclusion that the habitual residence remained in Australia.[1]   *Cf. Robert*, 507 F.3d at 996–97 (asking whether children's habitual residence changed after a nine-month stay in the United States and again after a three-week stay in France).  I would therefore vacate and remand for further proceedings on this one issue.

---

[1] Although Ms. Panteleris challenges the district court's finding, rather than the adequacy of its explanation, the court was required to compare the children's connections to each nation to determine which was their habitual residence as of May 2013, and in the absence of such a comparison, it is impossible to review the substance of the decision.  *Cf. Jenkins v. Jenkins*, 569 F.3d 549, 560–61 (6th Cir. 2009) (Kennedy, J., dissenting).